**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JIE CHEN, CGAH GRUBMARKET LLC, CELTIC HOUSE ASIA FUND LLC, CELTIC HOUSE ASIA PARTNERS LTD., and CELTIC 2023 ONE LTD., <br><br> Plaintiffs, <br><br> v. <br><br> CHAO "CHARLIE" WANG, YELAI "LARRY" LIU, MINGYANG "SKY" YU, and DOES 1 through 20, inclusive, <br><br> Defendants. | Case No.    1:25-cv-2163 <br><br> **VERIFIED COMPLAINT** <br><br> Jury Trial Demanded |

Plaintiffs CGAH GrubMarket LLC ("CGAH"), Celtic House Asia Fund LLC ("CHAF"), Celtic House Asia Partners Ltd. ("CHAP"), Celtic 2023 One Ltd., (collectively "Celtic House" or the "Celtic House Entities") and Jie Chen ("CJ" or "Mr. Chen", both individually and on behalf of the Celtic House Entities (the Celtic House Entities and Mr. Chen are referred to collectively as "Plaintiffs")), by and through their attorneys Wilson Sonsini Goodrich & Rosati, P.C., complain and allege on personal knowledge as to themselves and their own actions and otherwise upon information and belief against Chao "Charlie" Wang, Yelai "Larry" Liu and Mingyang "Sky" Yu ("Defendants"), as follows:

**NATURE OF THE ACTION**

The narrative presented herein is a modern retelling of Aesop's fable of *The Farmer and the Snake*,[1] arising from Defendants' blatant, malicious and oppressive misappropriation of the valuable business assets of Plaintiffs by a series of planned and calculated frauds, deceits and

---

[1] https://fablesofaesop.com/the-farmer-and-the-snake.html.

betrayals, tortious interference, defamation and open threats, solely for the purpose of usurping control of the Celtic House Entities from Mr. Chen and wrongfully profiting from their success.

### A. Under Mr. Chen's Leadership the Celtic House Entities Are Enormously Successful

1. Mr. Chen, the founder and leader of Celtic House, has been managing and operating the Celtic House Entities since approximately 2019 under the CHAP brand. Since its founding, Mr. Chen led the firm's external investment initiatives, participated at a deep and hands-on level in the management of the companies that CHAP invested in (referred to as the "Portfolio Companies"), and served on the boards of directors of a majority of the Portfolio Companies. Simply put, Mr. Chen is CHAP's most critical strategic, operational, and executional force—an irreplaceable figure within the CHAP system.

2. Under Mr. Chen's leadership, Celtic House has become one of the most successful early-stage venture capital firms in the country. In just six years, Celtic House has made more than 40 investments in early-stage companies in the United States, Canada and worldwide.

3. Included in this investment record, and again under Mr. Chen's leadership, direction and guidance, CHAP successfully invested in a series of star companies founded by Asian immigrant entrepreneurs, including GrubMarket, Uni Express Inc. ("UniUni"), Fantuan, Cerebral, Uni-One, and Bigway. These projects not only generated outstanding financial returns, but also demonstrated CHAP's deep support for the North American Asian startup ecosystem. As a result, Mr. Chen has received wide industry recognition. For example, he was named one of Forbes China's Top 60 North American Chinese Elites in 2021 and one of the Forbes Global Chinese Top 100 in 2022, where he was listed alongside NVIDIA CEO Jensen Huang in both years. In 2024, CJ was again recognized by Forbes China's 40 Under 40. Mr. Chen's record with Celtic House created significant value for Celtic House's investors and established him as a leading figure in the global Chinese investment and technology ecosystem.

At the same time, this success resulted in Mr. Chen creating a very valuable "brand" for himself as a highly astute investor and mentor of start-up companies.

4.      CJ's strong leadership, work and tremendous contributions to the success of the Celtic House Entities are not only highly recognized in the industry but also acknowledged and highly regarded by team members of the Celtic House Entities.  Defendants themselves have repeatedly acknowledged this reality.  For example, every year for the past several years Defendants have helped organize an annual birthday celebration for CJ coinciding with the Consumer Electronics Show in Las Vegas.  As another example, at a critical Investment Committee meeting just a few weeks ago, Defendant Yu openly told CJ and others that "Celtic House is CJ and CJ is Celtic House."

5.      CJ also creates significant value for Celtic House and the various Celtic House Entities through his mentoring of founders.  Frequently, this mentorship occurs when the leaders of the Portfolio Companies ask Mr. Chen to take a seat on their boards, and he is able to thereby serve as a director of the Portfolio Companies.  Mr. Chen serves on these boards for the purpose of, among other things, working with these founders to help the Portfolio Companies grow, and his record of success is outstanding.  As a result, Mr. Chen's contributions as a director of these Portfolio Companies are enormously important to the Companies as well as to Celtic House, the various Celtic House Entities and their investors.

B.      **Defendants' Malicious Scheme and Illegal Actions**

6.      Defendants' scheme to steal control of the Celtic House Entities through an illegal plot to betray and destroy Mr. Chen was triggered by CJ's expression of a restructuring plan to improve Celtic House beginning in early 2025 intended to ensure the continued success of the Celtic House Entities and their investors.  Mr. Chen was always open and transparent in his discussions with Defendants about this plan, which occurred in parallel with three events: (1) the exit of the Celtic House Entities' investment in one Portfolio Company, Fantuan, (2) another highly successful Portfolio Company, GrubMarket, announcing a financing giving it a valuation of $3.5 billion, and (3) with Mr. Chen's significant involvement and support,

UniUni's imminent completion of a $100 million financing round.  Moreover, according to various news articles, UniUni is reportedly looking to go public in late 2025 or early 2026 (*see, e.g.*, Exhibit A).

7.    In a desperate attempt to prevent CJ from moving forward with this plan, Defendants began engaging in a diabolical scheme of fraud and illegal conduct, which is continuing through today, to enrich themselves and damage Mr. Chen and the Celtic House Entities.  This scheme manifested in a number of specific wrongful acts, including the following:

(a)    Illegally transferring domain names owned and associated with the Celtic House Entities by unlawfully accessing Mr. Chen's personal electronic accounts with GoDaddy; Defendants' actions were designed to and did make access to important business records unavailable to Mr. Chen while, at the same time, Defendants (1) falsely claimed that Mr. Chen was not making these same business records available to them, (2) lied to various Celtic House investors and LPs by telling them that CJ was hiding business records, and (3) used fake signatures to claim that Mr. Chen was obligated to produce documents that he did not, and could not, have because Defendants had stolen his access to these documents and were preventing him from accessing the documents;

(b)    Misappropriation of substantial amounts of money from multiple Celtic House Entities without authorization by a variety of means ranging from using Mr. Chen's debit card to illegally charge tens of thousands of dollars in personal expenses to coercing and fraudulently concealing various information from multiple Portfolio Companies to convince them to pay Defendants;

(c)    Spreading and publishing defamatory comments known to be false, including false information about Mr. Chen being unfit to practice the investment business or profession, both verbally and in writing internationally to members of the Celtic House Entities, business affiliates, investor community, and other third parties to

deliberately destroy Mr. Chen's reputation, and falsely declaring that Defendants control the Celtic House Entities and Mr. Chen has been ousted;

(d)    Stealing Mr. Chen's board seat with UniUni, a Canada-based company for which Mr. Chen successfully helped raise over $100 million in just two years beginning in 2022 and helped lead the company to grow in valuation from $20 million to $490 million.  Defendants' illegal conduct with UniUni included using fraud and deception to (invalidly) appoint themselves to CHAP's board and cause Mr. Chen's nomination to the UniUni board to be wrongfully withdrawn; and

(e)    Engaging in multiple forms of self-dealing for the purpose of obtaining more of the value of the assets from the various Celtic House Entities and partnerships for themselves, at the expense of Plaintiffs.

### C.    Necessity of Relief Sought

8.    When Mr. Chen first learned of Defendants' behavior he was, in a word, shocked.  Because of Mr. Chen's hard work and diligence, Defendants' assets experienced multi-fold returns, while at the same time gaining incredible knowledge about the venture business that would not have been possible without Mr. Chen's help and knowledge.  Further, on a more personal note, Mr. Chen had been a mentor and advisor to Defendants and had no idea that they would betray him.

9.    Unfortunately, Plaintiffs are now learning of Defendants' greed and willingness to take illegal and unethical actions.  Defendants' ongoing illegal actions are causing, and in the absence of appropriate relief will continue to cause, serious damages to Mr. Chen, the Celtic House Entities and the Portfolio Companies.

10.    For example, Defendants' efforts to remove Mr. Chen from the board of UniUni, as well as the potential loss of trust in Mr. Chen as a result of Defendants' multiple and ongoing efforts to mislead investors, potential investors and LPs being misled by untrue disparaging and defamatory comments, and the other actions taken by Defendants (in addition to  Defendants' actions that Plaintiffs are only beginning to uncover) must be stopped.

Defendants' conduct has left Plaintiffs with no alternative but to seek immediate equitable and injunctive relief so that the interests of the Celtic House Entities and its investors can be protected.

## THE PARTIES

11.     Plaintiff Chen is a citizen of the United States and a resident of the State of California.

12.     Plaintiff CGAH is a limited liability company organized under the laws of California with its principal place of business at 42514 Albrae Street, Suite 12, Fremont, CA 94538, *see* Exhibit B attached hereto.

13.     Plaintiff CHAF is a limited liability company organized under the laws of Delaware with its principal place of business at 42514 Albrae Street, Suite 12, Fremont, CA 94538, *see* Exhibit C attached hereto.

14.     Plaintiff CHAP is a company incorporated in the British Virgin Islands with the Company number 2054709.  The registered office of CHAP is Water's Edge Building, Meridian Plaza, Road Town, Tortola VG1110, British Virgin Islands, *see* Exhibit D attached hereto.

15.     Plaintiff Celtic 2023 One Ltd. is a company incorporated in the British Virgin Islands with the Company number 2115819.  The registered office of Celtic 2023 One Ltd. is Coastal Building, Wickham's Cay II, P.O. Box 2221, Road Town, Tortola, VG1110,British Virgin Island, *see* Exhibit E attached hereto.

16.     Defendant Wang is a citizen of the People's Republic of China.  Defendant Wang was delegated with primary responsibilities for social activities and has performed some limited investor relations activities.  Defendant Wang regularly conducts business in the United States, including in New York and California.  Defendant Wang also invests, directly and indirectly, in companies based in and doing business in the United States.

17.     Defendant Liu is a citizen of the People's Republic of China and Canada. Defendant Liu was not delegated with any essential duties.  Defendant Liu regularly conducts

business in the United States, including in New York and California.  Defendant Liu also invests, directly and indirectly, in companies based in and doing business in the United States.

18.    Defendant Yu is a citizen of the People's Republic of China, Hong Kong and Canada.  Defendant Yu was delegated with primary responsibilities for account management, bookkeeping, review of legal documents, and back-office issues including HR and compliance. Defendant Yu regularly conducts business in the United States, including in New York and California.  Defendant Yu also invests, directly and indirectly, in companies based in and doing business in the United States.

19.    Plaintiffs do not know the true names and capacities of defendants sued herein as Does 1 through 20, inclusive, and therefore sue such defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe, and thereon allege, that each of the Doe defendants was at all relevant times, the agent, employee, or representative of the named Defendants and/or the other Doe defendants, was acting within the course and scope of such relationship, and is responsible in some manner for the occurrences alleged in this Complaint, and that Plaintiffs' injuries as alleged herein were proximately caused by their respective acts and omissions.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs assert a federal claim for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

21.    This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different States.  Defendants' unlawful actions have caused Plaintiffs to suffer actual damages well in excess of the $75,000 jurisdictional floor at issue.

22.     Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391 because Defendants (i) have intentionally availed themselves of the laws of New York and the United States by conducting business in this district; (ii) do substantial business within this district; (iii) are subject to personal jurisdiction in this district; and (iv) a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and Plaintiffs were harmed by Defendants' conduct within this judicial district.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### Mr. Chen and His Successful Global Venture Empire

**A.      Under Mr. Chen's Leadership the Celtic House Entities Have Become Among the Most Successful Venture Firms in the Country**

23.     Mr. Chen was born in China and then moved to Silicon Valley.  Mr. Chen's entire career has been based on both serving as an entrepreneur and working closely with entrepreneurs to build and create great companies.  Mr. Chen turned a modest beginning into a successful real estate venture while still a college student.  Thereafter, Mr. Chen co-founded CentreGold Capital, a $25 million "seed-stage" fund to invest in start-up companies that quickly became an enormous success.

24.     Mr. Chen founded Celtic House Asia Partners in 2019 to back entrepreneurs from the start of the company, through its IPO and beyond.  Consistent with his status as an immigrant, under Mr. Chen's leadership CHAP has invested in over 40 companies, more than half of which are led by immigrant founders.  Under Mr. Chen's leadership, CHAP has also become a leading venture investor to invest in Canadian and U.S. companies.

25.     Mr. Chen's methods and ability to identify great companies has led CHAP and the Celtic House entities to be enormously successful.  For example, Mr. Chen has led CHAP and/or the Celtic House Entities to be early investors in many companies that have become "unicorns" (*i.e.*, to be valued at over $1 billion in the private markets) or otherwise grown to be enormously successful.  Examples of such companies include GrubMarket (recently valued in

excess of $3.5 billion), as well as UniUni, Fantuan, Cerebral, Uni-One and Bigway. Investments in these companies have created enormous value for the Celtic House Entities and their investors.  Many of these founders have repeatedly praised and thanked Mr. Chen for his exceptional skills, hard work and mentorship, recognizing that Mr. Chen's skillset was critical to the success of these businesses.

26.     Mr. Chen's business acumen and skills have been repeatedly and prominently recognized in the business world and public press.  For example, in 2021, when he was 31 years old, Mr. Chen was named by Forbes as one of Forbes Top China Elite Business Leaders, an award he received again in 2022 (NVIDIA's CEO Jensen Huang was among the people listed with Mr. Chen).  In 2024, Mr. Chen was again recognized by Forbes, this time on the "40 under 40" list of prominent Chinese American tech leaders, further demonstrating his well-deserved reputation as one of the most sophisticated and successful Chinese American venture investors.

**B.     The Structure of the Celtic House Entities Under Mr. Chen's Leadership**

27.     As is common in the venture industry, CHAP is an entity incorporated in the British Virgin Islands ("BVI") and serves primarily as an organizing structure for the various Celtic House Entities.  CHAP itself generally does not invest in companies.  Instead, when Mr. Chen (or others affiliated with CHAP) finds an investment opportunity that he believes is worth pursuing, he will typically form a special purpose vehicle ("SPV") to invest in that company. The SPV would then typically be formed as its own partnership, with Mr. Chen as the general partner and the limited partners being investors in that partnership.  The funds invested in that partnership would then be used to make an investment in the company that Mr. Chen identified. This company would then be considered a "Portfolio Company" of CHAP, although CHAP would generally not be a direct investor in the company.  Instead, the investors in the company would be those who invested in the partnership, which would typically include many existing

members of CHAP as well as other limited investors who had historically invested with Mr. Chen.

28.     Also typical in the venture industry, as the general partner of the particular investment partnership, Mr. Chen would have control over the partnership's investment in the company.  Frequently this has included Mr. Chen taking a seat on the Portfolio Company's board.  Indeed, often the Portfolio Company would insist that Mr. Chen take a seat on their board, as in addition to wanting the capital investment from the partnership created by CHAP, the Portfolio Company specifically sought the input and guidance of Mr. Chen as a director.  This was and is important to these companies because they know of Mr. Chen's experience and reputation, and the value he has typically created for companies he has chosen to invest in and the mentorship he has provided to young CEOs and other company executives.

29.     Since Mr. Chen founded CHAP in 2019, he has always been its leader.  He has sourced most of the companies CHAP invested in (again, CHAP typically invested indirectly in these companies, through various partnerships and/or other SPVs, as described above), worked for these Portfolio Companies as a director, ran the day-to-day affairs of the partnerships and was the primary public face of CHAP.

### Defendants' Evil Schemes Begin to Come Out

30.     Through his highly successful business expansions, Mr. Chen generously mentored those he hired to work at CHAP, providing strong help and support to guide their careers, making them successful and teaching them how to be successful investors and venture capitalists.

31.     Defendant Sky Yu was hired in 2021, primarily to help on back-office matters, including HR and compliance.  Because of Mr. Chen's personal guidance and tutelage, Defendant Yu was able to expand his role at CHAP.  Recognizing the important role Mr. Chen played in Defendant Yu's career, Defendant Yu frequently addressed Mr. Chen with the honorific title of "Teacher."  Eventually, in 2024, Mr. Chen promoted Defendant Yu to certain executive level functions at CHAP and personally helped Defendant Yu raise his own funds

under CHAP for various investments.  At that time and even as late as early March, Defendant Yu repeatedly acknowledged Mr. Chen's leadership and irreplaceable role at CHAP and the various related Celtic House Entities, telling CJ in front of a number of individuals, including the other Defendants, as recently as March 7, 2025, that "CJ is Celtic. Celtic is CJ."

32.    While Defendant Liu has traveled infrequently since returning to China during the COVID-19 pandemic in 2020 and has only made a few small investments since that time, he has nevertheless benefitted from the financial security provided by Mr. Chen and the corresponding benefits Defendant Liu had by being associated with CHAP and the Celtic House Entities.

33.    Defendant Wang, despite informally holding the title of "Operating Partner," has long been responsible only for reception, social activities, and investor relations, with no involvement in real project execution.  At the end of 2024, Wang repeatedly told CJ that his father-in-law's family was in severe financial distress and that he could not even afford a plane ticket without the company's help.  Out of humanitarian concern for someone he considered a trusted colleague, CJ provided Defendant Wang with temporary support—only to later be repaid with betrayal.

**A.    Mr. Chen's Shared Vision and Plan for Celtic House Triggered Defendants to Desperately Steal Celtic House's Assets and Destroy Mr. Chen's Reputation**

34.    Despite the general uncertainty in both public and private markets in late 2024 and early 2025, CHAP and the various Celtic House Entities had a number of very positive results and news.  For example, GrubMarket, one of the largest Portfolio Companies in CHAP whose stock was held primarily through Plaintiff CGAH, has grown substantially since CGAH first invested in the company, with recent public reports estimating that its valuation exceeded $3.5 billion.  Mr. Chen also was working on the liquidation at a substantial profit of Celtic House's position in another Portfolio Company, Fantuan.  A number of other Portfolio Companies were also announcing significant positive news.

35.     For some time leading up to late 2024, Mr. Chen had observed that despite the terrific results, certain of his partners at Celtic House had been contributing less and less to the enterprise.  As a result, Mr. Chen concluded in November 2024 that he wished to distance himself from those individuals, preferably on amicable terms, while also ensuring the continued success of Celtic House.  As a result, beginning in early January 2025, Mr. Chen had multiple meetings and calls with a number of his management team members, including but not limited to the Defendants, about his plans for the future of Celtic House.  His plans included the reduction of staff in Celtic House until important Portfolio Companies exited in the near future, as well as bringing in more institutional LPs instead of individual LPs.

36.     While Mr. Chen's plan was very generous to his colleagues and team members, Defendants were not satisfied and instead began developing a plot to steal the valuable assets of Celtic House, permitting them to continue to reap the success that Mr. Chen had sown.  They were willing to take whatever actions were necessary to achieve their self-serving goals.

37.     Defendants recognized that their scheme could only succeed if Mr. Chen was no longer in the picture.  Thus began Defendants' effort to destroy Mr. Chen's reputation with knowingly false accusations and allegations while at the same time taking every action they could to take control of the Celtic House Entities and steal its assets, without regard to the damages to Plaintiffs or the Celtic House investors.

**B.     Wrongful Misappropriation of Valuable Business Assets by Fraud and Self-Dealing**

**1.     Domain Names: The Defendants Unlawfully Take Over Celtic House's Websites by Fraud and Entirely Eliminate Mr. Chen From Those Websites**

38.     As an example of the brazen, criminal means to which the Defendants have resorted to gain control of Celtic House, its investments and business, Mr. Chen recently discovered, much to his shock, that the Defendants have misappropriated his login credentials to access the Celtic House websites and effectively block Mr. Chen's access to them.  Even worse, after gaining exclusive control of the websites, the Defendants ***have completely***

*scrubbed any trace of Mr. Chen from the public face of the company he founded and ran for almost a decade*.

39.     On information and belief, the United States Federal Bureau of Investigation is currently investigating this outrageous conduct.

40.     The website domains—celticasia.com and celticvc.com (the "Celtic Websites")—were registered to, and paid for by, Mr. Chen through GoDaddy beginning in 2020.  Since that time, the Celtic Websites have been Mr. Chen's exclusive property, held continuously in his personal GoDaddy account and secured with his account credentials.  While Defendant Liu and his employee were given limited access to Mr. Chen's GoDaddy account from time to time to make necessary modifications to the websites to reflect updates in Celtic House business, plainly neither they, nor any other defendant, had authority to change the account credentials, block Mr. Chen's access to his account, terminate either Celtic Website, or remove Mr. Chen from the Celtic Websites.

41.     On or around March 19, 2025, and again on March 31, 2025, Mr. Chen attempted to log on to his personal GoDaddy account only to be denied access.  Further investigation revealed that the recovery email (which had been Mr. Chen's email) and the account PIN associated with the two domains had been changed without his consent.  Mr. Chen immediately contacted GoDaddy customer service to report the apparent unauthorized access and actions in his personal GoDaddy account.

42.     On April 5, 2025, with the assistance of GoDaddy's customer security team, Mr. Chen was finally able to regain access to his personal GoDaddy account only to discover that the Celtic Websites and Celtic Emails had been transferred to an unknown different GoDaddy account, without his permission, on March 26, 2025 (as shown below).



His personal GoDaddy account information also revealed that the unauthorized, illegal access to his personal account, the change of his access credentials and the transfer of the Celtic Websites had been carried out through actions taken in Pickering, Ontario, Canada.



43. Defendant Liu's employee lives in Ontario, Canada. When contacted, the employee reluctantly acknowledged that he had changed the credentials of Mr. Chen's GoDaddy account, but he refused to turn over the credentials of the account to which the Celtic Websites and Emails were transferred or access to that account.

44. Since the Celtic Websites and Emails have been illegally transferred out of Mr. Chen's personal GoDaddy account without his permission or any authority to an unknown GoDaddy account, Mr. Chen has lost any ability to modify or control those websites and emails.

45. On or about April 11, 2025, Mr. Chen attempted to visit his celticasia.com website only to find that it had been taken down completely:



That same day, Mr. Chen visited his celticvc.com website only to discover that any reference to Mr. Chen had been completely removed. In fact, prior to the Defendant's theft of the website, the website featured an entire page dedicated to Mr. Chen:



To be clear, the above page is completely missing from the celticvc.com website. No trace of Mr. Chen remains.

46.     What made Defendants' actions even more vicious was their demonstrated planning to mislead investors and/or business affiliates with traps they intentionally created while accusing Mr. Chen of wrongdoing.  For example, at the same time Defendants made access to important business records unavailable to Mr. Chen, they (1) falsely claimed that Mr. Chen was not making these same business records available to them, (2) made misrepresentations to various Celtic House investors and LPs by telling them that CJ was hiding business records and (3) forced, coerced and fabricated signatures to claim that Mr. Chen was obligated to produce documents that he did not, and could not, have accessed because Defendants had stolen his access to these documents and were preventing him from accessing the documents.

47.     Mr. Chen has engaged counsel to seek recovery of the two domain names and sent out a demand letter as attached in Exhibit F, but no response has been received to this date.

48.     The harm caused to Mr. Chen is not limited to his inability to access the websites or even the false statements Defendants made claiming that Mr. Chen should produce various documents (or had failed to produce various documents) when they knew they had blocked him from having access to these documents.  Mr. Chen, and the Celtic House Entities, have been damaged by his removal from the websites because Mr. Chen is rightly recognized as the public face of Celtic House and as its leader and his removal from the website makes it appear to Celtic House's investors, Portfolio Companies and others that he is no longer involved with Celtic House.  This malicious attack on Mr. Chen—indeed the idea that he would suddenly abandon all the investors and Portfolio Companies who follow and support him as the leader of Celtic House—has and is continuing to cause great monetary damages to Mr. Chen and the Celtic House Entities.

**2.    Stealing From the Celtic House Fund: Defendants Have Engaged in Multiple Acts of Self-Dealing and Breaches of Fiduciary Duty to Steal the Value of the Celtic House Entities for Themselves**

49.    As Mr. Chen has begun to review the actions of Defendants it has become clear that Defendants have engaged in multiple acts of self-dealing and breaches of fiduciary duty. These actions, taken by all the various Defendants in multiple ways, are another reason why they did not want Mr. Chen to restructure Celtic House: Defendants were (rightly) concerned that as part of this process he would discover their self-dealing and other wrongful conduct.

50.    For example, one of Celtic House's most successful investments is GrubMarket, which was identified as a great investment by Mr. Chen shortly after the company was founded.  Indeed, because of Mr. Chen's business acumen, Celtic House was one of the earliest investors in GrubMarket, and this investment has increased many times in value since Mr. Chen made the original decision to have Celtic House invest in the company.

51.    The Celtic House investments in GrubMarket are made through an SPV called CGAH GrubMarket LLC (a named Plaintiff).  In August 2022, one of Celtic House's LPs wished to invest $200,000 in cash in GrubMarket through CGAH GrubMarket.  Again, as with other Celtic House investments (*e.g.*, the Fintech Company described below), this was not unusual for the various SPV investors in the various funds set up by Celtic House.

52.    Rather than invest this money directly into GrubMarket as they were supposed to do, Defendants Yu and Wang engaged in a plot to personally pocket all of this money for themselves.

53.    Ultimately, when Mr. Chen realized what had happened, he confronted Defendants about their behavior, and they admitted that they had taken money that should have been invested in GrubMarket through CGAH GrubMarket.  But despite this admission Defendants have never returned the money or otherwise provided restitution to CGAH GrubMarket.

**3.    Illegal Use of Celtic House Property for Defendants' Personal Interest: Defendant Wang Has Stolen Money from Celtic House for Purchases at Neiman Marcus and Personal Travel**

54.    In addition to trying to steal money from investors, Defendant Wang has also stolen money from Celtic House.  For example, as recently as January 2025, Mr. Chen provided Defendant Wang with a Celtic House debit card issued by East West Bank.  Mr. Chen's instructions to Defendant Wang were clear and unambiguous:  Defendant Wang was to use this card solely to book a short-term rental house for an upcoming Celtic House partner group gathering to be held during the Computer Electronic Show in Las Vegas, Nevada.  This was one of Defendant Wang's regular responsibilities at Celtic House, as his job included arranging logistics for Celtic House gatherings.

55.    Defendant Wang knew, or at least should have known, that he was not authorized to use the card for any other purpose, and certainly not for his own personal expenses.  While Wang used the debit card to book the house, he never returned the debit card. Instead, Wang used the debit card in late-March and early April 2025 to make a series of wholly unauthorized purchases including for personal travel, restaurants and luxury items at high end retailers, racking up tens of thousands of dollars in personal expenses.  Defendant Wang only stopped using CHAP's business debit card for his own personal expenses when Mr. Chen discovered his unethical and improper charges and immediately directed the bank to "freeze" the card.

**4.    Defendant Wang's Misappropriation of Celtic House Assets by Threats and Breach of Duty**

56.    Defendant Wang has repeatedly violated the fiduciary duties of care and loyalty he owes to Celtic House and the various Celtic House Entities.  For example, in 2021, Mr. Chen identified a fintech startup based in Canada (the "Fintech Company") worthy of investment and created a fund called Celtic House Asia Partners Opportunity I, L.P. ("CHAP 1") to make an investment.  Like many other investment opportunities identified by Mr. Chen, the Fintech Company investment has proven to be extremely valuable for Celtic House and

CHAP 1.  Indeed, since the initial investment, the Fintech Company has received several additional financings at increasing valuations.

57.    In approximately October 2024, one of CHAP 1's limited partners wished to make a further investment in the Fintech Company.  This was not unusual, and this type of investment was typically welcomed by both the Portfolio Company and the SPV created to invest in the Portfolio Company.  As this was a fairly routine occurrence, Mr. Chen instructed Mr. Wang to handle the details of this investment, which was ultimately structured to be made in two tranches of $200,000 and $500,000.  The first of those investment tranches was made in October 2024; the second is still pending.

58.    On March 25, 2025, Mr. Chen received an urgent and shocking call from the founder of the Fintech Company.  In this call, Mr. Chen was told that Defendant Wang was insisting that the Fintech Company pay Defendant Wang personally a 6% cash commission purportedly for securing the $700,000 investment described above.  Defendant Wang had no basis to make this demand.  No one—not Celtic House or the Fintech Company—had ever discussed or promised Defendant Wang any payment in connection with this investment and Defendant Wang was not entitled to any commission or other fee for this investment.

59.    The Fintech Company founder further told Mr. Chen that Defendant Wang threatened him that if the Fintech Company did not pay Defendant Wang the fee he demanded, Defendant Wang would personally work to destroy the Fintech Company's founder by telling other entrepreneurs and potential investors that the founder had no credibility and was not to be trusted.

60.    Not surprisingly, Defendant Wang has done everything possible to hide his illegal and unethical conduct from Mr. Chen, ranging from first attempting to deny that he had asked for any fee to later admitting that he asked for a fee but claiming that he was entitled to it because he was responsible for the investment.  Of course, none of this is true; the simple reality is that Defendant Wang was trying to steal money from one of the investors in CHAP 1

by claiming that he was entitled to a "kickback" as a result of this investment and then intended to hide the payment from his partners.

> **5.    Theft of Board Seat: Defendants Try to Illegally Remove Mr. Chen from GrubMarket's Board**

61.    Defendants have simultaneously been conspiring to alienate Mr. Chen from GrubMarket and its direct and indirect investors and to seek to deprive Mr. Chen of his GrubMarket board seat as well as his role as Manager of CGAH.  As part of this effort, Defendants have been making near round-the-clock efforts to contact CGAH investors to repeat and further disseminate their unfounded allegations against Mr. Chen in order to sow enmity, eliminate his goodwill among investors, and seek to destroy his reputation and ability to effectively manage Celtic House and the Celtic House Entities.

62.    Defendants are engaged in this illegal and wrongful behavior because they want the credit and benefits that go with being a director of such a prominent and successful company as GrubMarket.  In addition, Defendants are motivated to try and steal Mr. Chen's role as Manager of CGAH because the Manager of CGAH has sole discretion to allocate the 20% "carried interest" fee provided to the Manager upon a GrubMarket liquidation event. Because of Mr. Chen's investment acumen, CGAH's stake today in GrubMarket, which is currently valued at approximately $3.5 billion, is potentially worth tens of millions of dollars. Defendants are hoping to steal this money for themselves by replacing Mr. Chen as Manager of CGAH.

63.    Defendants have also engaged in a pattern of harassment against various CGAH limited partners and other CGAH investors.  This harassment has included invading the privacy of various individuals by showing up at their homes late at night, making threats of physical harm against them and others if they support Mr. Chen, and making knowingly false, defamatory and damaging statements about Mr. Chen in his capacity as a GrubMarket director.

64.    For example, as recently as April 4, 2025, Defendants attended a dinner hosted by GrubMarket's Chief Executive Officer Minyi Xu and the company's Chief Financial Officer

Kathy Xu.  During this dinner Defendants repeatedly insulted Mr. Chen and claimed he was unethical and unfit to serve as a director of GrubMarket.  During this same dinner Defendants admitted that they wanted to remove Mr. Chen from the GrubMarket board of directors. Defendants are engaged in this plot to remove Mr. Chen as director despite knowing that during the time he has been on the GrubMarket board the company's value has grown enormously and that Mr. Xu, GrubMarket's founder and CEO, wants Mr. Chen to stay on the GrubMarket board.

### 6. Theft of Board Seat: Defendants Try to Illegally Remove Mr. Chen from His Board Seat at UniUni

65.    Another of Mr. Chen's very successful investments for Celtic House has been its investment in a Canadian company known as UniUni.  Mr. Chen discovered UniUni, a "last mile delivery" company founded in 2019.  Celtic House, under Mr. Chen's direction, invested more than $12 million in UniUni since 2022 and Mr. Chen took a seat on the UniUni board of directors.  UniUni has grown substantially since that investment and its valuation has grown accordingly.  In fact, in 2024, UniUni was ranked 11th among the fastest growing technology, media, life sciences, fintech and energy companies in North America on Deloitte's Fast 500 List, and 4th on the Fast Canada list.  And once again, other high-profile, prominent investors have followed Mr. Chen's lead: in November 2024, UniUni announced Bessemer Venture Partners had led an over-subscribed $30 million C2 financing, marking more than $100 million in new investor funding for UniUni in just the prior 12 months.

66.    Celtic House investments in UniUni are mainly made through an SPV called Celtic 2023 One Ltd. ("Celtic 2023").  Again, as is typical given Mr. Chen's role in sourcing and investing in the company, he was (and remains) the only voting and managing member of Celtic 2023 which gave him the exclusive right to make all key decisions concerning the investment.  In January 2025, however, Defendant Yu, acting in concert with the other Defendants, unleashed a secret plot to steal control of Celtic 2023 away from Mr. Chen.  As shown below, Defendant Yu had one of his employees send a message to Celtic 2023's limited

partners with the subject line "Compliance Request" seeking their signature approving what was innocuously described as merely "a procedural change to Celtic 2023 One Ltd. to improve overall compliance of the entity."



67.     As Defendants well knew, such a request would seem reasonable and ordinary coming from an employee of Defendant Yu, as Yu was typically responsible for back-office compliance related functions at Celtic House.  But the proposed change was anything but a compliance formality:  In reality, the modification that was being sought was the replacement of Mr. Chen as the sole manager of Celtic 2023 with another entity the Defendants simultaneously sought to control, CHAP.

68.     Defendants knew that Yu did not have authority to unilaterally seek approval from the LPs of Celtic 2023 to remove Mr. Chen.  Defendants further knew that had Celtic House's LPs or the investors in Celtic 2023 understood what was being asked of them, they would not have agreed to this malicious and value-destroying scheme to replace Mr. Chen as a UniUni board member.  For this reason, Defendants did not disclose the true purpose of the

document in Yu's email to investors. Many LPs were very confused about the change and did not sign. Yu disappeared from February 7 to early March and claimed that he was not able to speak. However, despite saying he was unavailable, he called one of the SPV LPs to ask for signatures on February 21.

69.     On the heels of these efforts to surreptitiously wrest control over Celtic 2023 through subterfuge and deception, Defendants resorted to new lows in March 2025 to steal Mr. Chen's UniUni board seat. Technically, Mr. Chen held his UniUni board seat pursuant to UniUni's Shareholders' Agreement and a Nomination Agreement between CHAP and a Portfolio Company called CHVP GP (Canada) Inc. ("CHVP").

70.     In order to withdraw Mr. Chen's nomination to the UniUni board, Defendants Yu and Liu orchestrated a fraudulent takeover of CHAP's board in March 2025. Specifically, Defendant Yu purported to notice a CHAP shareholders meeting for March 14, 2025 to, among other things, appoint additional directors. Although Plaintiffs have been unable to obtain any record of the proceedings of a March 14, 2025 shareholders meeting, the Defendants' subsequent actions suggest that Defendants Yu and Liu purported to appoint themselves directors of CHAP at that meeting. But to the extent such a meeting took place at all, it was not properly noticed to all CHAP shareholders or properly convened under BVI law by CHAP's sole director, Yongjie Chen ("Yongjie"), in accordance with CHAP's Articles of Association and relevant law.

71.     Perhaps realizing these defects, in a botched attempt to cover their tracks, on April 16, 2025—over a month after the supposed director appointments—Defendant Yu sent Yongjie a document purporting to be shareholder resolutions appointing himself and Defendant Liu as CHAP directors. However, the document was dated March 13, 2025—the day *before* the supposed shareholder meeting took place. There would have been no need to hold a shareholders meeting on March 14, 2025 to appoint directors if there had been a valid appointment on March 13, 2025, and there is no explanation for the delay of *over a month* before sending Yongjie notice of the purported appointments. These inconsistencies lead to the

conclusion that the resolutions are in effect forgeries created in or around April 16, 2025 and backdated in an attempt to "paper over" the invalid appointment of Defendants Yu and Liu to the CHAP board.

72.     Then, on March 17, 2025, Defendant Yu—impersonating a duly appointed director of CHAP—purported to notice a CHAP directors meeting for March 21, 2025, the sole agenda items being (1) "Discussion on election of agent as Authorized Signatory of the Company" and (2) "Voting on the election."  Yongjie attempted to dial in to the meeting, but after waiting for the better part of an hour for other attendees to connect, concluded that there would in fact be no meeting: the notice and invitation had been an artifice calculated to give the false imprimatur of corporate formality.  To the extent such a meeting took place at all, it was not properly noticed or properly convened in accordance with CHAP's Articles of Association and relevant law.

73.     Later on March 21, 2025, Liu—still impersonating and purporting to act as a "director" of CHAP—transmitted a document titled "Request for Nominee Director Replacement" directing CHVP to "approve the replacement of the current nominee director, Jie Chen, with David Adderley as per the terms outlined in the Shareholders Agreement."  On March 25, 2025, Mr. Adderley delivered a so-called "Written Notice for Removal and Appointment of Nominee Director" to UniUni to that effect, purporting to nominate himself as director in place of Mr. Chen.

74.     Mr. Chen's purported removal from the UniUni board and Mr. Adderley's nomination were invalid, void, and of no effect, as Mr. Liu never properly became a "director" of CHAP, and thus had no authority to direct CHVP to withdraw the nomination of Mr. Chen. Rather, the sole director of CHAP has only ever been Yongjie, who has confirmed to Plaintiffs that he previously nominated Mr. Chen and continues to nominate Mr. Chen for appointment to the UniUni board.  Mr. Chen is pursuing, or intends imminently to pursue, appropriate remedies against Mr. Liu and others for their improper attempt at usurpation of authority over CHAP and to reinstate his UniUni board seat in the relevant jurisdictions.

### 7.    Defendant Yu Breaches his Fiduciary Duty to CHAP and Jeopardizes a Million Dollar Investment

75.    Defendant Yu has repeatedly violated the fiduciary duties including to act honestly, in good faith and in the best interests of the company, that he owes to CHAP, a BVI company in which the Defendants and Mr. Chen are the sole members.  For example, in 2024, CHAP contractually committed to a $2 million investment over two years in a venture fund (the "Venture Fund").  CHAP's investment was to be funded in four equal $500,000 tranches, which made CHAP one of the Venture Fund's anchor limited partners.  As is common in such limited partnerships, under the investment's terms, if any LP fails to meet a capital call, it is within the Venture Fund's rights to cancel the investment and retain any principal previously invested.  Yu, who, as noted above, handled Celtic House's back-office functions, was responsible for receiving and responding to capital calls, including from the Venture Fund, and ensuring such contractual obligations were met.

76.    By the beginning of 2025, CHAP had fulfilled $1 million of its $2 million investment commitment, and the Venture Fund investment was performing extraordinarily well.  However, in February 2025, when the third tranche was due, Yu ignored the capital call notices and failed to make the required payment on CHAP's behalf in complete violation of his fiduciary responsibilities he owed to CHAP.

77.    It was only in late March, when the Venture Fund sent a notice of default directly to Mr. Chen, that he learned of Yu's complete dereliction of duties, which now put CHAP's entire investment at risk of forfeiture.  To make matters even worse, when Mr. Chen tried to immediately rectify the situation by attempting to wire $240,000 from CHAP's bank account at East West Bank to the Venture Fund, Yu reported the transaction as fraudulent— despite the fact that, as Yu well knew, the transaction was not only legitimate, but CHAP's contractual obligation to meet.

78.    Yu's actions have caused significant harm to CHAP and Mr. Chen.  CHAP has been harmed because, in failing to make its contractually obligated capital call, its entire

million-dollar investment and ability to further invest in the Venture Fund is at risk of forfeiture.  Moreover, by falsely reporting legitimate CHAP and other Celtic House banking transactions attempted by Mr. Chen as somehow fraudulent, Yu has not only jeopardized CHAP's and Mr. Chen's long-term relationship with East West Bank, but also their respective reputations and standing in the investment community.

**8.    Defendant Yu Defrauded Mr. Chen and the LPs of Celtic 2023 One Ltd.**

79.    Celtic 2023 One Ltd. had outstanding 10,000 shares issued in their entirety to Mr. Chen as the sole shareholder and sole director of this entity.  Again, this is standard procedure, as Mr. Chen is the Manager of this entity.  Celtic 2023 One Ltd. was structured to hold shares of UniUni, a company based in Canada for which CJ successfully helped raise over $100 million just from 2022 onwards, with substantial valuation increase from $20 million to $490 million, and with aggressive global expansion of business to cover the majority of states in the United States.

80.    Typically, when there is a liquidation of the assets in an SPV (in this case the UniUni shares), the shares of the SPV will be transferred or converted in such a manner so that the LPs can get the benefits of the SPV's assets.  However, in or around late January 2025, Defendant Yu coaxed investors and CJ into signing some DocuSign documents for the purpose of changing the structure of Celtic 2023 One Ltd.  Defendant Yu, as part of his ordinary duties, had been responsible for sending standard documents on fund structure and related organizational issues to LPs and/or Mr. Chen and therefore the LPs and Mr. Chen relied on Defendant Yu to handle these documents in an appropriate manner, consistent with his legal and fiduciary duties.  However, in a gross breach of his duties, Defendant Yu misrepresented to the LPs and Mr. Chen what the true purpose of the documents he sent was designed to do.  His actions have resulted in considerable harm to both Mr. Chen and Celtic 2023 Open Ltd.'s LPs.  A true and correct copy of the resolution sent by Defendant Yu is attached hereto as Exhibit G.

### 9.     Defendants' Slander and Libel Claiming that Mr. Chen has Lost Control over Celtic House Entities

81.    With clear knowledge that they had no legal rights to force CJ to resign, Defendants, by and through the fraud and misconduct referenced above in an effort to steal assets and control from CJ, made demands by counsel with false claims supported by no evidence or corporate authorities to force CJ to resign.

82.    While CJ has made it clear through counsel of his active roles and control over Celtic House Entities, since at least March 2025, Defendants have engaged in an actively false and misleading campaign to broadly disseminate verbal and written information and materials to investors of Celtic House Entities declaring that they now have control over Celtic House Entities and that CJ has been ousted, in furtherance of Defendants' scheme to gain control and claim the success of Celtic House Entities.

83.    Such false and defamatory statements have resulted in tremendous loss of CJ's reputation, trust by investors and further resulted in substantial damages.

### 10.    Defendants' Slander and Libel Claiming that Mr. Chen Engaged in Criminal Activities and Was Unfit to Do Business, All for the Purpose of Defaming Mr. Chen

84.    As summarized above, once Defendants learned of Mr. Chen's plans with respect to Celtic House, they hatched their plan to steal the value of Celtic House and the various Celtic House Entities for themselves.  To that end, they needed to discredit and defame Mr. Chen with both investors in the various Celtic House Entities and, more broadly, within the Asian-American venture and investment community.

85.    This scheme led them to write a letter to Mr. Chen on March 19, 2025, which included a variety of deliberately false and misleading allegations against Mr. Chen (the "March 19 Letter").  Defendants knew, or were reckless in not knowing, that the allegations and statements they made in the March 19 Letter were false and/or misleading.  Defendants concluded the March 19 Letter by claiming that Mr. Chen had, among other things, committed

fraud and engaged in self-dealing, and on this basis Defendants "demanded" that Mr. Chen resign from all his positions with Celtic House and the various Celtic House Entities.

86.    Again, Defendants knew, or were reckless in not knowing, that the statements in the March 19 Letter were false and defamatory.  Nonetheless, not only did Defendants send this letter to Mr. Chen, but deliberately and intentionally sent this letter to virtually all of the LPs and multiple investors in the various Celtic House Entities as well as various executives and/or board members of different Celtic House Portfolio Companies and others.  Defendants' reason for sending the March 19 Letter—which is defamatory on its face—to these third parties was simple and straightforward: Defendants sought to defame Mr. Chen and damage his business and reputation with his investors and business associates.

87.    Defendants' March 19 Letter also included a "demand," which Defendants claimed to make on behalf of the Celtic House Entities, asking that the Celtic House Entities investigate Mr. Chen's wrongful behavior, that Mr. Chen resign from all his positions with Celtic House and the Celtic House Entities, and that he turn control of the Celtic House Entities over to Defendants.

88.    In response to the March 19 Letter, Mr. Chen had the various Celtic House Entities retain counsel to respond to the March 19 Letter, including to investigate the allegations set forth in the March 19 Letter.  Counsel responded to the March 19 Letter in a letter dated March 27, 2025 (the "March 27 Letter").  While Defendants' March 19 Letter alleged that Defendants had evidence to support all of their allegations, Defendants did not provide any evidence.  Accordingly, the March 27 Letter requested Defendants to provide the evidence that Defendants claimed they had, and even invited Defendants to meet with counsel to provide any additional information or other evidence to support their allegations against Mr. Chen.

89.    Defendants did not meaningfully respond to the March 27 Letter.  Instead, on April 8, 2025, Defendants filed a complaint against Mr. Chen in Alameda County Superior Court (the "April 8 Complaint").  Defendants' complaint, which they brought in both their

individual capacities as well as on behalf of Celtic House—which they do not control and therefore lack the ability to file suit in the name of—primarily alleged derivative claims against Mr. Chen in his capacity as Manager of CGAH.

90.    The April 8 Complaint is essentially a near-verbatim rehashing of the allegations in the March 19 Letter.  Once again, no factual evidence is provided to support these allegations, although Defendants continue to assert that they have evidence to support their claim.  Tellingly, the Complaint did not provide factual substantiation for the allegations in the Demand or attach any documents that might lend any such substantiation.  This was precisely the defect pointed out in the March 27 Letter—and it continues to go unaddressed and uncured.

91.    Defendants know that none of the allegations they make against Mr. Chen are true.  Their only goal of making these allegations—and equally important from Defendants' perspective in widely distributing these allegations against Mr. Chen to Celtic House's investors and potential investors, as well as distributing them to Mr. Chen's business partners and associates, the broad Asian American investor community and Asian Canadian investor community—is to defame Mr. Chen and destroy his professional reputation and career.

92.    Defendants have also used the April 8 Complaint as a tactical instrument to deceive and prejudice Celtic House investors against Mr. Chen.  They have distributed it along with disparaging messages about Mr. Chen through various messaging channels.  The following screenshots are just a few examples:



93.    Defendants' efforts to spread the false statements contained in these documents and then to use various forms of social media to amplify their messages has become a textbook method for spreading misinformation today.  Defendants' goal is clear: to destroy Mr. Chen's good name and reputation before there is any chance for him to respond or get the truth out.  Defendants' wrongful conduct must be stopped and Plaintiffs, including Mr. Chen, are entitled to appropriate remedies for the harms caused by Defendants.

## CAUSES OF ACTION

### First Cause of Action
**Tortious Interference with Prospective Economic Advantage (All Defendants)**

94.    Plaintiffs reallege and incorporate by reference each and every allegation of paragraphs 1 through 93, inclusive as though fully set forth herein.

95.    Plaintiffs have business relations with Celtic House's investors, its Portfolio Companies, and various other business associates.  In addition, as an active and respected member of the venture community, Mr. Chen has prospective business relationships with many potential investors and business associates.

96.    At all relevant times, Defendants knew of those business relationships.

97.    Defendants maliciously, knowingly and intentionally interfered with Plaintiffs' business relations by using improper or illegal means that amounted to a crime or an independent tort.  Specifically, Defendants defamed Plaintiffs by making deliberately false and misleading allegations concerning Plaintiffs in correspondence and legal filings and widely distributing these allegations with the intention of disrupting the business relationships between Plaintiffs and investors, Portfolio Companies, and other business associates.  Defendants also misappropriated Celtic House Websites, property owned by Mr. Chen, to erase Mr. Chen—the face of Celtic House and key to its success—from the websites, and in doing so intended to disrupt Plaintiffs' business relationships with investors, Portfolio Companies, and other business associates.

98.    Defendants' interference caused injury to Plaintiffs' relationships with investors, Portfolio Companies, and other business associates.

99.    Therefore, Plaintiffs are entitled to injunctive relief and damages in an amount to be determined at trial.

## Second Cause of Action
### Defamation (All Defendants)

100.    Plaintiffs reallege and incorporate by reference each and every allegation of paragraphs 1 through 99, inclusive as though full set forth herein.

101.    Defendants made false and defamatory statements to investors, Portfolio Companies, and other business associates concerning Plaintiffs, including by social media and other methods to broadly disseminate a March 19 Letter and April 8 Complaint that includes multiple false statements about Mr. Chen and further claiming that Defendants had control over the Celtic House entities while Mr. Chen had been ousted.

102.    The individuals and entities to which Defendants published the false statements are third parties without privilege.

103.    By knowingly making the false statements and broadly publicizing these statements, including in social media platforms, to investors, Portfolio Companies, and other business associates, Defendants intended to cause harm to Plaintiffs' reputation.  At a minimum, Defendants were negligent in making the false statements.

104.    Defendants' false statements concerning Plaintiffs disparaged Plaintiffs in their profession and caused harm, including economic and monetary damages.  Indeed, Defendants' false and defamatory statements were designed to tarnish Mr. Chen's professional reputation within the venture and investment industry.

105.    Therefore, Plaintiffs are entitled to injunctive relief and damages in an amount to be determined at trial.

**Third Cause of Action**
**Conversion (Defendant Wang)**

106.    Plaintiffs reallege and incorporate by reference each and every allegation of paragraphs 1 through 105, inclusive as though fully set forth herein.

107.    Defendant Wang knowingly and wrongfully converted monies belonging to Plaintiffs by using a Celtic House debit card to make unauthorized purchases, including for personal travel, restaurants, and luxury items at high end retailers.

108.    Defendant Wang's improper conversion of Plaintiffs' funds caused damages.

109.    Therefore, Plaintiffs are entitled to damages in an amount to be determined at trial.

**Fourth Cause of Action**
**Conversion (Defendant Liu)**

110.    Plaintiffs reallege and incorporate by reference each and every allegation of paragraphs 1 through 109, inclusive as though fully set forth herein.

111.    Mr. Chen owns two Celtic House websites, which he paid for and are registered to him.

112.    Defendant Liu knowingly and wrongfully converted property belonging to Mr. Chen by accessing Mr. Chen's GoDaddy account without authorization, transferring the two Celtic House websites to a different account to which Mr. Chen has no access, and deleting one website in its entirety.

113.    Defendant Liu's improper conversion of Mr. Chen's property caused damages.

114.    Therefore, Mr. Chen is entitled to injunctive relief and damages in an amount to be determined at trial.

**Fifth Cause of Action**
**Declaratory Judgment (All Defendants)**

115.    Plaintiffs reallege and incorporate by reference each and every allegation of paragraphs 1 through 114, inclusive as though fully set forth herein.

116.    Mr. Chen and Defendants are parties to the Fourth Amendment to the Operating Agreement of CGAH LLC ("CGAH Operating Agreement"), effective as of December 15, 2021.

117.    Section 4.1(A) grants broad powers to the Manager of CGAH, including "full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of [CGAH]…."

118.    Section 4.2(A)(b) provides that CGAH "shall have one Manager with a term of ten (1) years" and designates Mr. Chen as the Manager.

119.    Section 4.2(A)(c) states that "[t]he Manager, Mr. Jie Chen, shall be entitled to serve as the Manager of the Company for the full term of ten (10) years and shall not be disqualified from such service during the full term of ten (10) years of his service unless he elects to resign from the position of the Manager of [CGAH]."

120.    There is an actual controversy between the parties regarding their legal rights under the CGAH Operating Agreement.  Defendants dispute the scope of Mr. Chen's authority as Manager, asserting, among other things, that he lacks the power to hire counsel on CGAH's

behalf, bind CGAH in certain investments, or manage CGAH's day-to-day affairs.  Mr. Chen asserts that he has these powers as CGAH's Manager.

121.    Based on this dispute, Plaintiffs respectfully request the Court resolve the scope of Mr. Chen's authority under the CGAH Operating Agreement, declaring that Mr. Chen has the authority to hire counsel, make investments, and manage CGAH's day-to-day affairs under Article 4 of the CGAH Operating Agreement.

122.    There is also an actual controversy between the parties over whether Defendants or any group of Members have the authority to remove Mr. Chen as the Manager.  Defendants purport to be able to force Mr. Chen out of his role as Manager, despite the clear protections in Article 4 of the CGAH Operating Agreement.  Mr. Chen asserts that Defendants cannot force him out of his role, and that Mr. Chen's ten-year term as Manager can only cease if he elects to resign, which he has not done.

123.    Based on this dispute, Plaintiffs respectfully request the Court declare Mr. Chen is the sole Manager of CGAH, has not resigned as Manager of CGAH, and cannot be removed unilaterally by Defendants or any other Members.

<u>Sixth Cause of Action</u>
**Breach of Fiduciary Duty (All Defendants)**

124.    Plaintiffs reallege and incorporate by reference each and every allegation of paragraphs 1 through 123, inclusive as though fully set forth herein.

125.    Defendants are partners of CHAP and members of CGAH.  Defendants owed fiduciary duties of loyalty and care to Plaintiffs and were obligated to act in Plaintiffs' best interest.

126.    Defendants breached their fiduciary duties by knowingly acting against Plaintiffs' interests in:

      a.    Defaming Mr. Chen and harming his professional reputation;

      b.    Undertaking a malicious scheme to replace Mr. Chen as a UniUni board member;

c.    Engaging in improper self-dealing and usurpation of corporate opportunities to benefit themselves;

d.    Stealing corporate funds for personal use;

e.    Demanding a kickback from an investor;

f.    Misappropriating the Celtic House Websites, terminating one website entirely, and removing Mr. Chen's profile from another website;

g.    Secretly conspiring to remove Mr. Chen from GrubMarket's Board; and

h.    Failing to make a contractually obligated capital call and subsequently impeding efforts to rectify the situation.

127.    Defendants' breaches of fiduciary duties have caused harm to Plaintiffs by, among other things, jeopardizing existing and future investments and destroying the value of investments.

128.    Therefore, Plaintiffs are entitled to injunctive relief and damages in an amount to be determined at trial.

## Seventh Cause of Action
## Unjust Enrichment (All Defendants)

129.    Plaintiffs reallege and incorporate by reference each and every allegation of paragraphs 1 through 128, inclusive as though fully set forth herein.

130.    As outlined above, Defendants have engaged in wide-ranging misconduct which has resulted in significant and unjustified financial losses to the Plaintiffs.

131.    Defendants have benefited from receiving funds at Plaintiffs' expense by engaging in numerous acts of self-help and misappropriation.

132.    Equity and good conscience require restitution and/or disgorgement of the ill-gotten monies to Plaintiffs.

133.    To the extent damages are not recoverable under other theories of liability for these acts, Defendants are liable for unjust enrichment and Plaintiffs are entitled to damages in an amount to be determined at trial.

**Eighth Cause of Action**
**Civil Conspiracy (All Defendants)**

134.    Plaintiffs reallege and incorporate by reference each and every allegation of paragraphs 1 through 133, inclusive as though fully set forth herein.

135.    Defendants entered into a civil conspiracy when they agreed to engage in a plan to (1) steal the value of Celtic House's assets for themselves (2) slander and defame Mr. Chen to deliberately destroy his reputation so that they could claim some credit for Celtic House's success (3) take the board seats that Mr. Chen had been elected to as a director at various Portfolio Companies for themselves and (4) engage in multiple forms of self-dealing for the purpose of obtaining more of the value of the assets from the various Celtic House Entities and partnerships for themselves, at the expense of Plaintiffs and the investors in the various Celtic House Entities.

136.    Defendants each committed overt acts in furtherance of the conspiracy, including by making false and defamatory statements concerning Plaintiffs to investors, Portfolio Companies, and Plaintiffs' other business associates.

137.    Defendants intentionally participated in the furtherance of the plan.

138.    Defendants' conspiratorial acts caused harm to Plaintiffs.

139.    Therefore, Plaintiffs are entitled to injunctive relief and damages in an amount to be determined at trial.

**Ninth Cause of Action**
**Computer Fraud and Abuse Act (18 U.S.C. § 1030) (Defendant Liu)**

140.    Plaintiffs reallege and incorporate by reference each and every allegation of paragraphs 1 through 139, inclusive as though fully set forth herein.

141.    The Celtic House Websites paid for and registered to Mr. Chen were stored on GoDaddy's computers and computer systems, which affect interstate commerce.

142.    Defendant Liu intentionally accessed a protected computer without authorization or in excess of his authorization by accessing Mr. Chen's GoDaddy account without

authorization with the intent to damage data by transferring the Celtic House Websites to a different account, then terminating one Celtic House website and erasing Mr. Chen's profile from another Celtic House website.

143.    Defendant's unauthorized access, transfer of two Celtic House websites to an unknown GoDaddy account, termination of one Celtic House website, and erasure of Mr. Chen's profile from a second Celtic House website caused harm to Plaintiffs in an amount over $5,000.

144.    Therefore, Plaintiffs are entitled to injunctive relief and damages in an amount to be determined at trial.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against Defendants as follows:

1.    Compensatory damages according to proof;

2.    For an order enjoining Defendants from: (1) making statements defaming Chen to the companies' investors or business partners; (2) attempting to oust Chen as Manager, including by pressuring, coercing, or otherwise soliciting the companies' investors to call for Chen's removal; (3) limiting Chen's access to information about the companies or its business; or (4) otherwise interfering with Chen's ability to manage the affairs of the companies or their business;

3.    Exemplary damages;

4.    Declarations that:

    a.    Chen has the authority to hire counsel, make investments, and manage the Company's day-to-day affairs under Article 4 of the CGAH Operating Agreement; and

b.  Chen is the Manager of the Company, has not resigned as Manager of the Company, and cannot be removed unilaterally by Defendants or any other Members;

5.    Interest at the maximum legal rate on all sums awarded;

6.    Reasonable attorneys' fees as permitted by agreement or law;

7.    All costs of suit herein; and

8.    Such other and further relief as the Court deems just and proper.

## **<u>JURY DEMAND</u>**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury as to all triable issues.

Dated: April 17, 2025                   Respectfully submitted,

                                        WILSON SONSINI GOODRICH & ROSATI
                                        Professional Corporation


                                        _____
                                        DAVID J. BERGER, State Bar No. 2163400
                                        650 Page Mill Road
                                        Palo Alto, California 94304
                                        Telephone: (650) 493-9300
                                        Facsimile: (866) 974-7329
                                        Email: DBerger@wsgr.com

                                        MORRIS J. FODEMAN, State Bar No. 2865905
                                        1301 Avenue of the Americas, 40th Floor
                                        New York, New York  10019
                                        Telephone: (212) 999-5800
                                        Facsimile: (866) 974-7329
                                        Email: mfodeman@wsgr.com

                                        *Attorneys for Plaintiffs Jie Chen, CGAH
                                        GrubMarket LLC, Celtic House Asia Fund
                                        LLC, Celtic House Asia Partners Ltd., and
                                        Celtic 2023 One Ltd.*

## **VERIFICATION**

I, Jie Chen, Plaintiff herein, declare under penalty of perjury that I have reviewed and approved the foregoing Verified Complaint, and that its allegations are true and correct to the best of my information, knowledge, and belief.


Dated: April 17, 2025

DocuSigned by:

4D8663C9FFD94F1...

_____

Jie Chen